MCPC v. National Labor Relations Board Mr. Falovito? Yes. Good morning, Your Honors. May it please the Court, my name is Dean Falovito. I represent the appellate petitioner MCPC Inc. I would like to reserve three minutes of rebuttal time. Your Honors, I think the first thing this Court has to decide today is if it is going to depart from the Stair to Cece's decision in mushroom transportation and hold that there is no requirement for past group action, future group action, and instead hold that you can find concerted activity when at a lunch a brief statement is made, one head is nodded, and perhaps a verbal yes is made, and nothing else happens after that. Well, more happened there. There was a discussion about labor shortage. There was a discussion about how to accomplish jobs and tasks and so forth. It was in the midst of that. It was, in fact, a team meeting. It was a team lunch meeting. It was a lunch. Yes, it was a lunch brought in that was scheduled by the... It wasn't a water cooler meeting. They were actually sat down to lunch in a room and started talking about a lack of engineers and so forth? Correct. They went to a restaurant. And the issue, though, is, and this is a big issue going throughout it, the lack of engineers, that was not a unique conversation to that lunch. All the witnesses, from the CEO all the way down, says they've been talking about the lack of engineers for a long time, and they've been trying to do something about it for a very long time, including... You know, the administrative law judge, as well as the appellate panel, both concluded that Mr. Galanter was involved in concerted protected activity. That's entitled to a great deal of deference. Wouldn't you agree? Not whenever they only use half of the law to make that finding. I think this Court's ruling on mushroom transportation is very, very clear. Why doesn't mushroom... How do you argue that mushroom transportation survives in light of the intervening Supreme Court case that directs us to give deference to the agency? Well, I still think under mushroom transportation, even under the NLRB's ruling, I have yet to actually see an NLRB case, quite frankly, where this specific set of facts, actually this momentary instantaneous set of facts, becomes collected activity. I think one of the cases that went throughout a lot of the briefs, and I think the Board is going to cite a lot of, is Worldmark by Wyndham. And that was a case where it was almost completely opposite, where the funny case I call the Tommy Bahama case, where they announced to the employees that they have to tuck in their Tommy Bahama shirts, and in the presence of other employees, with another employee, two people got into an argument with their supervisor. And the Board found there that we gleaned by the fact that they did it in front of the other supervisors, and they got into a heated argument and proposed, you know, we don't want to do this, this, this, and this, that there was concerted activity implied. In this case, okay, all they were doing is we need to hire more engineers. I mean, that sounded different, but changed the record. They had heard that before. What changed this, okay, and what my argument is that even if you find concerted activity, which I don't think you can with the multiple admissions that there was no past action planned, no past action, there was no future action, it was just it. They repeated there's no engineers. It leaves the scope of protected activity, though, whenever Mr. Galanter then mentions another employee's salary. But there's a finding by the ALJ that he does that in the context of making the point that there are these funds available that could be used to hire additional staff instead of paying this amount to an executive. So we have, again, a finding based on testimony that was part and parcel of the same conversation, leading to the conclusion that it's part of the concerted protected activity. I think the ALJ made several findings. Some of them are head scratchers, including talking about he discredits the charging party. The charging party says, I mentioned Andy Jones was making around $400,000. And another witness said, no, you said Peter DeMarco. And the judge says, I don't believe the charging party. I believe the other witness and said Peter DeMarco. But yet somehow, and this is probably the only way I would say that the judge, I don't think there's substantial factual evidence to support the judge's findings in that regard. And it took it to another level. That's when it became nonprotected when he disclosed intentionally whether he thought or not, whoever it was, he didn't have that person's permission to disclose their salary. And that's where it left the confines of whether or not it was actually protected or not. Mr. Foley, can I ask you to address the second area of argument here, which is your position on whether Burnup and Sims or Rightline is the governing standard when we're looking at the termination decision? Right. Well, I think it has to do with some cause and effect. I mean, the ALJ was going with Burnup and Sims, so that's what I went with, too. I wasn't even sure whether Rightline would necessarily apply. But you could argue that it wasn't like an intervening event. Like, he would not have been in the CEO's office and lying to the CEO had he not said something at the lunch about another employee's salary. So the board is contending that it was all part of the same concerted activity, so I think Burnup and Sims would apply and that they have to prove, the board has to prove that he did not commit the misconduct that we said that he did. I don't think Rightline is really that far off. That's kind of more like a McDonnell Douglas pretext, and it would kind of go back the same way. We would say he was terminated for this activity not related to his alleged concerted activity, and the board would have to show that that's inconsistent with the facts. Supposing we were to agree with the administrative law judge that the rationale you gave for the discharge simply did not exist. The rationale was, as I recall, using company computers to access wage or find information concerning employees. Supposing we agree that did not exist. Well, I think you can still, and I'm not saying that we disagree with that, saying that the issue of the access was really, put frankly, never actually decided, I don't think. I think the evidence there, but the CEO testified. I brought him in to talk about, you know, what's going on here. You might have some improper access and gave him a chance to explain himself. But if we agree with the administrative law judge that the rationale that you gave for the discharge simply was not correct, not true, simply did not exist, all we have is Gallanter engaged in lawful, protected, concerted activity. Well, it depends on what reason you're talking about for the termination. I think the CEO's unrebutted testimony is very clear. He says, I asked him, he was evasive, and then he outright lied and implicated two other employees, and that employee was at the trial, too, saying, I never talked to him about this, and yet he told the CEO that he did. So once he put two and two together there, he testified. He's like, once I got this on my desk, I wasn't automatically going to fire the guy. But didn't the employer assert in proceedings in the administrative court and before the panel that the rationale, the reason that was given for the discharge was Gallanter's access to private, financial, personal information through company computers? Yeah, and I didn't mean to address it. That has to do with the position statement we submitted very early on, and the board continually saying that that was conflicting, shifting defenses. I don't think it was shifting. I think, if anything, it was incomplete. The position statement we submitted said accessing and disseminating confidential information, and in the position statement I wrote, you know, he lied about the two employees in Buffalo as well. So maybe it could have been articulated a little bit better. But once we were presenting the evidence to the ALJ, under oath, our CEO very clearly testified that the reason he terminated him was because he lied to him at least twice, and he had evidence that he had lied to them, and he just deemed that he was not untrustworthy. So even if there was concerted activity, which I still claim there isn't unless you're willing to overrule mushroom transportation, even if there is concerted activity, he was not terminated for the concerted activity. If there is concerted activity, I think it is him saying we need to hire more engineers. Well, he'd been saying that, the CEO had been saying that, and I don't even think it was offered on the record that he was terminated for saying we need to hire more engineers. Let's go for a second to the NLRB's standard that they used to support their decision. It seems like all of the members who participated relied on the Myers test. Yes. Okay. In your opinion, did the disconduct meet the Myers test? Well, I think the one thing in Myers is they say there has to be a pragmatic approach, because Myers notes that every case is somewhat different. You can't cast these things with a wide net, and I absolutely think it does, because no other where do we have testimony where the meeting, I think, was interesting. This lunch wasn't preplanned. It was scheduled a few minutes beforehand. Nobody knew it was happening until Mr. Del Bosso showed up and said, hey, you guys want to go to lunch? Okay. There was no preplanning activity like, hey, let's get him in here, let's talk about this or that. It wasn't a new rule change. You'll see a lot of the board cases, you know, the employer assembles the employees and says, hey, we're changing our overtime, we're changing our dress code, this or that. There's shouting. There's yelling. All the board cases that they cite are factually distinguishable. You'll never get one where, okay, this is. So you think the facts here are consistent with Myers? Yes. I think the board should have been consistent in their outcome. Yes. And I think that the board, look at the board's brief. Look at the ALJ's decision. They cite half of mushroom transportation. I mean, mushroom transportation even assumes that the argument is coming in their brief, in their decision, because they say, well, this doesn't mean we want to stamp out the initial buds, if you will, of concerted activity. But they even then say that argument loses much of its force when it appears from the conversations themselves that no group action of any kind is intended, contemplated, or even referred to. And then they call that just griping. And that's exactly – there was no group action even – you look at the – even take a Mr. Galanter's testimony. There was nothing like, well, what are we going to do about the executive compensation? What are we going to do about the more engineers? I mean, the testimony is there when the company was already trying to hire more engineers. And there's also testimony unrebutted that the issue of the lack of – executive compensation was not linked at all to the lack of engineers. Everybody testified to that, and there's nothing that even – that rebuts that. So he's making a complaint which is completely outside of – he's making a statement that's completely outside of the main issue here of whether or not there was more engineers. And I just think the board's own witnesses says he didn't talk to us about it before, didn't talk about it after, we didn't do anything. It was a one-time, less than a minute. And one guy – the one guy who allegedly spoke wasn't even called as a witness. The one guy says, I think somebody said yes, and somebody nodded their head. I think that's protected activity for employees to be talking about being overworked because of insufficient staffing in the engineering department, and that maybe you could hire more engineers. And if you hadn't paid that engineer or that executive $400,000, you could have gotten two more engineers to help us out because you're really overworked. You don't think that's legitimate employee conversation, concerted activity? If that's all that they're saying, then no, and particularly if it's been said time and time again and that's not the reason that the person was terminated. Sorry, one last question on the right line issue. If we are thinking that right line may apply, what is the reason, the alternative non-statutory reason that he would have been fired anyway? Is it the lying? Is it the accessing of files? Is it the disclosure of confidential information? What is your position as to the reason that he otherwise would have been terminated? It was the lying, and I make an example. It's as if you were questioned by the police. You're innocent of a crime, yet you lied to the police. If Mr. Gallant was actually innocent and Mr. Treblecock, the CIO, never even got, he said on the record, I wanted to see what was going on here. I brought him in to ask him about it, and suddenly he started lying to me, and that's why I made the decision to fire him. Thank you. Mr. Rubin. Good morning, Your Honors. May it please the Court. I'm Greg Morrow for the National Labor Relations Board. I would ask the Court. I'm sorry. No, that's okay. That's okay. Mr. Rubin is sitting down somewhere. Should I be arguing the next case? No, no. Then I'm really in trouble. But I'll start with this one. We are asking the Court to affirm the Board's finding of an unlawful discharge because it's supported by substantial evidence and reasonable credibility findings, and I want to start with that point. We have these factual findings here, as was discussed this morning. They show protected concerted activity at that group team-building meeting, and we have admissions by the employer's CEO at the time of the discharge that that conduct at the meeting, discussing or disclosing an executive salary information. In the context of making a concerted complaint about staffing shortages and workloads as impacted by executive salary, that that was the reason for the discharge. Now, wait a minute. How do you get to that, that the shortages weren't impacted? Where do you get the finding that the shortages were impacted by executive salary? The finding is that the employees asked about that. So they asked about executive salary. They asked about, certainly it's unclear who they referred to, but they asked about executive salary. One employee, Galanter, not the employees, Galanter. No, I see, Your Honor. I want to put it in the context of the facts we have here. After the employer congregates the employees together for a team-building meeting. For lunch. For lunch, to discuss their concerns, the employees take their employer up on that offer and say, one concern we have, Galanter raises the other employees. No, no, no. It's use the right pronoun. Yes. Use the right pronoun. Not one concern we have. Galanter, speaking himself, asks the question. Do you agree with that? And two employees indicated agreement after they had. How did they indicate agreement? The record shows that one employee nodded his head and another employee. A wink and a nod. A nod, yes. But the record shows in the board's finding, it's a reasonable finding, was that a couple of employees indicated agreement with Mr. Galanter's concern. Through what? A nod. Doesn't the other employee say that it made him uncomfortable that this was even raised at lunch? An employee did say that the meeting made him uncomfortable. But the fact that it made an employee uncomfortable doesn't render the activity unconcerted or unprotected. I guess the point I'm getting to. Yes. The point I'm getting to is the very beginning of this case. Because to me it seems like there's a lot of confusion between the standards, what the ALJ found, what the ALJ applied, between what the NLRB found and what the NLRB applied. But the bottom line is no concerted activity in this case. There's no case, right? It's definitely a key finding. Okay. And I'm just saying I think it's a very well-supported finding. And I'm not resisting your question. I understand if you just look at Mr. Galanter commenting about executive salary and its impact on this concerted concern of workloads, that's what you have. But the context is, and the context matters under settled laws, this was a group meeting. Well, what was the context? This wasn't a group meeting to complain about executive salary. It was a group meeting for employees to raise concerns. It was a group meeting to go out to lunch. Marco comes in. Who was the gentleman that came in? Galbaza comes in and says, let's go to lunch. No mandatory attendance. Who wants to join me at lunch? No agenda. And there's no requirement for it to be concerted activity that there be an agenda. I understand that, but that's set to facts. Right. They're at lunch. Galanter starts talking about the fact that you hired a new executive whose name is Jones. Right. And, you know, he's making about 400 Gs. That's right. But what we're looking at is whether that supports the board's finding of concerted activity. To do what? Isn't there a requirement that the activity be engaged in with the object of initiating, inducing, or preparing for group activity? Yes. Without that, then it's griping, as referenced in Mushroom Transportation. Right. So what is the group activity that was being promoted or induced here? The group activity is complaining about a term and condition of employment, their workloads, and the staffing shortages. As part of that, Mr. Galanter raises the issue of executive compensation as impacting that term and condition of employment. Now, as to it being concerted, we have several things here. The fact that it was a team-building lunch, that's what the employer called it, does mean something. Subtle law holds that the board can infer a concerted intent from such a meeting. Not that we need to necessarily make that inference here, where multiple employees spoke up about staffing shortages. This was someone from management coming from out of town who, to promote goodwill, offers to take some employees out to lunch. Right. And as a team-building meeting, he's offering, if you have concerns to raise, please do so. And they did. No, no, you keep saying they did. You want to get this. It's an adept use of pronouns, but they're important use of pronouns. Galanter did. Not they did. Galanter did. Ron, I'm not trying to fight you, and I apologize. Ron, I'm not trying to fight you either. I'm just trying to point out it's not they did. Right. I, too, am trying to be very clear about the record. And what's clear about the record is at this team-building meeting, not just Mr. Galanter, but other employees discussed a term and condition of employment. How many employees were there? I believe it was four, counting Mr. Galanter. And Mr. Del Balzo. The director of engineering. Mr. Del Balzo, Mr. Galanter, and two others. And I think three other employees. Three others. And those other employees also discussed staffing shortages and workloads. They all did that. And then as part of that discussion, Mr. Galanter said, well, you could ease our workloads and the staffing shortages perhaps if you use this money being paid to a recently hired executive to hire more of us. And then, again, however you want to put it, other employees indicated agreement with that conduct. So under settled law, that removes any doubt that Mr. Galanter was acting with other employees and not just for his own benefit. Under settled law, those facts support an inference and a finding of concerted activity. That's the point I was trying to make in putting all of that context together. And then, of course, the other key thing here, and this is what supports the finding of an unlawful discharge, is at the time of the discharge, the CEO admits that's why he fired him for his conduct at the meeting, which the board found was protected. Where is that admission? Well, that's his statement at the time of discharge. But the CEO says he fired him for his conduct at the meeting, but he explains it was the conduct of disclosing, at least in the CEO's mind, of disclosing improperly salary that he learned about through the Internet. Well, actually, the company's problem is that the alleged misconduct did not occur, according to the credited testimony, and the company offers no grounds for reversing the board's credibility findings. Now, stick with that. The credited testimony, you like part of Galanter's testimony, but you discarded the rest of Galanter's testimony. You didn't believe that Galanter was talking about Jones. You thought he was talking about DeMarco, even though Galanter said, I said it was Jones. Right. But then you like the rest of it. I mean, how can that be the foundation for your factual findings? It was that kind of internal inconsistency in what Galanter himself said, and that's the charging party. Your Honor, I'll take – I actually think there's three points there that I'll try to go through quickly in turn. I think first it's what was the admission, what was the credited testimony about the reason for the discharge, and the credited testimony shows that the CEO said, I'm uncomfortable about this information getting out at the meeting, and that that's why he was fired. I'm sorry, that's not his testimony. That is what the ALJ says that he admitted, but in fact he doesn't. His testimony appearing on pages 120 to 121 relates entirely to this individual wasn't providing me with where the information came from, admitted the information came from him, wouldn't tell me where the information came from. I already had information from IT that he had global access. We're in consulting engineering, et cetera. I determined he wasn't trustworthy, and we could not move forward with Jason employed by our organization. My gut was telling me everything was adding up to a lack of trust. No, I understand that, Your Honor. I should have been more precise. Mr. Galanter's credited testimony about what he was told at the moment he was discharged was that it was for his conduct at the meeting, disclosing salary information. But in crediting that, the ALJ says that the gut testimony statement made by Galanter, that is Galanter's version of it, that his gut feeling was that he did nothing wrong and he was being let go because the CEO was embarrassed at the release of this information. The ALJ says in a footnote that that was admitted by the CEO. That is not. That is simply a misstatement of the testimony on the record because that's not admitted by the CEO. And isn't the only other corroborating testimony as to the reason articulated for firing, being something other than lying, Exhibit 6? And Exhibit 6 not only has a printout of a date on it that postdates the events in question so that it doesn't seem like he could have relied on it, but it also has a copyright postdating that. And that issue, although it's raised by the employer here, isn't addressed at all by the ALJ or the Board. What do we do with that when all we have is the testimony of Galanter and the one piece of corroborating testimony not only doesn't corroborate but suggests that Galanter may have testified falsely at the hearing? There are a couple of things you can answer. We do have Galanter's credited testimony about what he was told is the reason for his discharge. But also, as you know, in the company's position statement, which their attorney filed with the Board, they say, yes, we fired him for accessing and disclosing executive salary at the meeting, which the Board found was protected concerted conduct. The problem with that allegation of misconduct is the credited evidence showed it did not happen. Mr. Galanter is credited. I'm sorry, that puts us to Burnup and Sims. You argue that right line applies so that the question then is would he have been terminated anyway, right? I did not argue that. We did not argue that right line applies, Your Honor. The Board did apply Burnup and Sims in the alternative, and as part of that, one thing I'm pointing out is that the company claimed he was fired for accessing and disclosing confidential information, but the general counsel proved that didn't happen. And it's not just Galanter's credited denial of doing that. It was also unrebutted testimony and corroborated by the fact that the employer's own audit of its access, of its computer files, showed no improper access by Mr. Galanter. They also show, I mean, Bill Cox's testimony also indicates that in addition to firing Galanter for lying about how he learned about the information, he fired him for implicating other employees, which involved the Buffalo employees at the meeting in Cleveland. He said, I learned about this from the employees in Buffalo, and he went out and talked to the employees in Buffalo. He said, we never had any discussion about that. Now, aren't all those character issues that are part of Bill Cox's testimony that you discounted? Your Honor, they're saying that somebody who didn't know whether it was Jones or DeMarco was more credible on that point. Well, first of all, I want to point out as to the credibility issue that it is a deferential standard. The court has to assess whether the challenge credibility finding is hopelessly incredible. Now, here, but you still have to be supported by substantial evidence. Yes. And then we also have the ALJ's own credibility finding that Galanter's responses to the CEO in that meeting were, quote, purposely vague and evasive in his explanation to Bill Cox as to where he obtained the salary information. Your Honor, the judge made balanced credibility findings. He credited Mr. Galanter's honor, but he corroborated testimony about where he got the information, which was publicly available sources, not confidential files that the company claimed. But he also noted that, yes, he was a bit evasive in that meeting, but he has a right to not divulge everything about his protected concerted activity. He's not required to answer truthfully when asked, how did you engage in this activity? Where did you get the information? And he does say truthfully the first time. I got it from the Internet. When the CEO didn't accept that, Mr. Galanter was apparently flustered and said, I'm not sure, it's hard for me to name a person, but perhaps it was the two individuals. Couldn't you conclude from that? Couldn't the executive easily conclude from that? Look, he first tells me he got it from the Internet, then he tells me he got it from the Buffalo employees. I checked with the Buffalo employees. This guy's lying. And the ALJ made that finding. He was purposely vague and evasive. Right, but there's a couple problems. One is an employer can't lawfully discharge an employee simply for being evasive about the nature and scope of their protected activity. But, I'm sorry, you in your brief, when you cite the trade waste incineration case for that proposition, you're suggesting that the issue of accessing the computer is the protected activity? Because elsewhere in your brief you argue that it is not, that that predates the protected activity, which was the communication at lunch. The board never found that accessing the computer, meaning the company's confidential files, is protected activity. The board found that alleged misconduct simply didn't occur. Well, if that accessing of the computer was not part of the protected activity, then how does it even fall anywhere near the trade waste incineration case for him to lie about that unprotected activity? Because the employer is grilling him about his preparation for protected activity, and as this and other courts have noted, you have to protect necessary preliminary steps towards concerted activity. Otherwise, employers can just retaliate against those preliminary steps and nip full-blown concerted activity in the bud. That's what the employer did here, and the court should not allow it. It's not good policy. And I see my time is up, Your Honors, but I would just ask in light of the deferential standard to note that settled law and substantial evidence supports the finding that this was concerted activity and that the board reasonably found, consistent with the employer's admissions at the time of the discharge, that that protected activity was the reason for the discharge, and it's therefore lawful. Thank you, Your Honors. I'm sorry, Counselor, can I just one last brief question? Of course. I raised the issue of Exhibit 6. Is there anything else you can tell us about why the copyright, not the print date, but the copyright on that document post-dating the events in question doesn't fatally undermine the testimony that was provided by Galanter at the hearing? Your Honor, what I can tell you from the credited testimony is that he looked at that website for the first time before the meeting and discharge in question, but he printed it out again in preparation for the subsequent hearing for the board, and my understanding is that the copyright and the date on the page were of the time he printed it out. And the company provides no basis for saying that it was inherently incredible for the judge to believe, Mr. Galanter, that he printed out that information or looked at it earlier. Thank you. All right. Thank you, Mr. Warren. Mr. Cavalito. Thank you, Your Honors. Just to get to what we were just last talking about, what I think is inherently incredible is the fact that Mr. Galanter testified that he saw on the Internet that an unnamed executive salary was making $362,000, and somehow he extrapolated that, and the next thing you know he's going around saying Peter DeMarco makes $400,000. I just think that's rather unbelievable and not supported by substantial evidence for the judge to credit that testimony. And really, I think Your Honors are on the right track. You know, he said he took an average from various sources. I think he focused the testimony, he focused on one guy at MTM Technologies. Is it the case that that could not happen because he happened to have been accurate? Well, I think it's interesting to note, we talked about when he was being questioned by Mr. Treblecock, he didn't, I know the board wants to say we're shifting our defenses somewhere, I don't think that's the case, but Mr. Galanter, when he was questioned by Mr. Treblecock, never said, oh, no, no, no, Mike, I saw this on the Internet, I saw Andy Jones is making this, you know, he's purposely evasive. And suddenly when we get for the board, he's like, oh, I've got a printout here, here's how all the steps that I made to go to $400,000. Well, he says Andy Jones. I asked him under oath at least four times, he said Andy Jones. And the judge says, no, I don't believe him. You know, Teague, I just want to ask you a different question. You're not arguing that the ALJ and the panel's decision that your employer here violated Section 8A1, that the policy under which he was fired was actually a violation of 8A1? Right. The policy, we've resolved that issue with the board. We've redone our policy and gone back and forth, so that's why it's not an issue of appeal. But the policy, even though it was rewritten, would still prohibit somebody from, without that other employee's permission, disclosing the salary. It's like employee A told employee B their salary, okay, you can talk about it and whatnot. But there's no evidence that Mr. DeMarco or Mr. Jones gave Mr. Gallant a permit, told him what his salary was and gave him permission to disseminate it. Even the revised one, I think the board's law says, well, that still can be restricted. You just can't stop two employees from conversing about their salary. And our policy, I think, was a little vague on that, so we agreed to modify it. So, like I said, it wasn't really necessary. I think it's important, Mr. Treblecock's testimony and another thing that the ALJ just ignored, it's like I wasn't necessarily going to fire him. I wanted to get all the facts and what happened in the investigation. I think one real quick point, I don't know whether to call it bootstrapping or not, what the board's attempting to do, but when you ask doesn't the conversation have to be pointed to group action, and they're saying, well, the conversation itself was the group action. If that's the case, if we kick down that door, then every single conversation in every lunchroom across America is going to become considered an activity before they put a shield of immunity up on the employees where they can lie to their CEO and not be fired. Thank you. Thank you both for your arguments.